**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ***J.P.*** *and all others similarly situated, et al.,* | : | |
| | : | **Case No. 2:04-cv-692** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| | : | |
| **BOB TAFT,** *et al.* | : | **Magistrate Judge Norah McCann King** |
| | : | |
| **Defendants.** | : | |

**OPINION AND ORDER**

**I.     INTRODUCTION**

This matter is before the Court on Defendants' First and Second Motions for Summary

Judgment (Doc. # 24 and # 25), Defendants' Motion to Disqualify Kim Brooks Tandy as

Counsel for Plaintiffs (Doc. # 51), and Plaintiffs' Motion for Class Certification (Doc. # 6).

Plaintiffs filed this 42 U.S.C. § 1983 ("Section 1983") action against Bob Taft, in his official

capacity as Governor of the State of Ohio, the Ohio Department of Youth Services ("ODYS"),

and Thomas Stickrath, in his official capacity as Interim Director of Youth Services

(collectively, "Defendants").[1]   In their Amended Complaint, Plaintiffs allege that Defendants

violated the First, Sixth, and Fourteenth Amendments of the United States Constitution, and

corresponding provisions of the Ohio Constitution, by denying access to the courts for juveniles

committed to ODYS as juvenile delinquents or serious juvenile offenders.  Plaintiffs request

---

[1] Plaintiffs initially named Geno Natalucci-Perischetti in his official capacity as Director
of Youth Services as defendant; however, in their Amended Complaint, Plaintiffs, recognizing
that Mr. Natalucci-Perischetti resigned as Director of Youth Services in December 2004, named
Mr. Stickrath as a defendant in place of Mr. Natalucci-Perischetti.

declaratory and injunctive relief, asking the Court to declare that Defendants' actions were

unconstitutional and to require Defendants to provide them with access to attorneys.

For the reasons that follow, the Court **GRANTS** Defendants' Second Motion for

Summary Judgment, **DENIES** as moot Defendants' First Motion for Summary Judgment,

**DENIES** as moot Defendants' Motion to Disqualify Kim Brooks Tandy as Counsel for Plaintiffs

and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' Motion for Class Certification.

## II.    PROCEDURAL BACKGROUND

Plaintiffs' original Complaint was filed on July 29, 2004.  The Complaint named four

individual plaintiffs:  J.P., S.J., D.B. and H.H.[2]  On September 27, 2004, Plaintiffs filed a motion

requesting class certification.  (Doc. # 6).  That motion is fully at issue before the Court.  (Doc.

# 6, # 32 and # 44).

On January 7, 2005, Defendants filed their First Motion for Summary Judgment.  (Doc.

# 24).  In that motion, Defendants argue that the four Plaintiffs named in the Complaint failed to

exhaust their administrative remedies.  That motion is fully at issue before the Court.  (Doc. #

24, # 45 and # 55).

On January 12, 2005, Defendants filed their Second Motion for Summary Judgment.

(Doc. # 25).  In that motion, Defendants argue that the four Plaintiffs named in the Complaint

lack standing to maintain this action and that S.J.'s claim is moot.  That motion is fully at issue

before the Court.  (Doc. # 25, # 46 and # 56).

---

[2]On July 7, 2005, Plaintiff H.H. voluntarily dismissed her claim against Defendants.
(Doc. # 87).  Accordingly, the Court has omitted all discussion of H.H's claim against
Defendants.

On March 17, 2005, Defendants filed a motion requesting disqualification of Plaintiffs'
Attorney, Kim Brooks Tandy.  (Doc. # 51).  Defendants argue that Attorney Tandy filed
substantive testimony with the Court in an affidavit supporting Plaintiffs' opposition to
Defendants' Second Motion for Summary Judgment and, therefore, has caused herself to become
a material witness in this case.  That motion is fully at issue before the Court.  (Doc. # 51,  # 71
and # 74).

On May 17, 2005, the Court granted Plaintiffs leave to file an amended complaint.  (Doc.
# 76).  In its Order, the Court stated that the "pending motions for summary judgment will be
deemed to apply to the amended complaint."  The Amended Complaint added two plaintiffs:
M.M and T.M.  (Doc. # 77).  Neither of these two Plaintiffs, however, were addressed in
Defendants' First or Second Motions for Summary Judgment, nor have Defendants filed a
supplement to either motion.  Instead, Defendants addressed these two Plaintiffs in their Third
Motion for Summary Judgment.  (Doc. # 89).

On August 1, 2005, Defendants filed their Third Motion for Summary Judgment.  (Doc.
# 89).  In it, they summarize the arguments set forth in their first two summary judgment motions
and incorporate case law on exhaustion recently announced by the Sixth Circuit Court of
Appeals.  In addition, in arguing lack of standing, Defendants set forth the current status of the
four Plaintiffs named in the original Complaint as well as the current status of the two Plaintiffs
added in the Amended Complaint.  Plaintiffs have not responded to Defendants' Third Motion
for Summary Judgment.

Instead of responding to Defendants' Third Motion for Summary Judgment, on August
16, 2005, Plaintiffs filed a Motion for Extension of Time in Which to Respond to Defendants'

Third Motion for Summary Judgment.  (Doc. # 90).  Plaintiffs assert that they need additional

discovery to oppose the motion because, in it, Defendants set forth an entirely new theory, *i.e.*,

that the named Plaintiffs were provided access to the courts through a newly created legal

assistance program.  That motion is fully at issue before the Court.  (Doc. # 90, # 92 and # 95).

## III.    FACTS

For purposes of summary judgment, the Court will consider the facts in the light most

favorable to Plaintiff.

## A.    Individually-Named Plaintiffs

### *1.    Plaintiff J.P.*

Plaintiff J.P. was incarcerated at the Scioto Juvenile Correctional Facility beginning in

January 2002, as a result of an adjudication through the Hamilton County Juvenile Court.  (Am.

Compl. ¶ 6).  J.P. had significant needs concerning mental health and medical care.  *Id.*  On

February 14, 2003, J.P. was sexually assaulted by a Juvenile Corrections Officer ("JCO") while

on "suicide watch" in a special unit.  *Id.*  She was 17 years old at the time.  *Id.*  The JCO since

has been convicted of sexual battery against J.P., and that of another juvenile resident.  *Id.*

J.P. filed a grievance in March 2003, and also sent a letter to the chief inspector regarding

the assault.  *Id.*   J.P.'s claims were referred to a private attorney five months after Plaintiffs filed

the original Complaint in this lawsuit.  *Id.*  On February 14, 2005, J.P.'s conditions of

confinement suit was filed in this Court, Case Number 2:05-CV-00147.  (Doc. # 56, Affidavit of

Rhonda Richard at ¶ 7(a) attached as Exhibit A17 to Defendants' Reply to Plaintiff's Opposition

to Defendants' Second Motion for Summary Judgment).  J.P. was released on parole on May 3,

2005.  (Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(a) attached as Exhibit C to Defendants'
Third Motion for Summary Judgment).

      **2.**     ***Plaintiff S.J.***

     Plaintiff S.J. was incarcerated at the Scioto Juvenile Correctional Facility from October
2003 until July 2004, as a result of an adjudication through the Hamilton County Juvenile Court.
(Am. Compl. ¶ 7 ).  On December 27, 2003, she was physically assaulted by a male JCO who
followed her into her room and slapped her on the side of her face repeatedly with the palm of
his hand.  *Id.*  S.J.'s eardrum ruptured and she sustained bruises and welts on her face.  *Id.*  She
was 17 years old at the time of the assault.  *Id.*

     S.J. was threatened with retaliation if she reported the incident, and the JCO instructed
her to report the injury as self-inflicted.  *Id.*  S.J. was also threatened with receiving more time at
Scioto if she told the truth about what happened.  *Id.*  S.J. filed a grievance regarding this
incident, and following the advice of an attorney from the Ohio Public Defender's Office, she
sent a letter regarding the assault to the chief inspector on the same day.  *Id.*

     S.J. requested an attorney to prevent possible retaliation by the JCO, and she wanted to
ensure that the JCO who assaulted her would not return to work in her unit.  *Id.*  S.J. also
believed that an attorney would assist her in securing better medical care.  *Id.*  Scioto
Superintendent John Morgan informed S.J. that ODYS could not provide her with an attorney.
*Id.*  Subsequently, however, ODYS did in fact offer S.J. legal assistance to address her
conditions of confinement complaints.  (Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 16 attached
as Exhibit A16 to Defendants' Reply to Plaintiffs' Opposition to Defendants' Second Motion for
Summary Judgment).  S.J. has not responded to ODYS's offer.  *Id.*

On May 6, 2004, the JCO who assaulted S.J. was discharged from ODYS.  (Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 10 attached as Exhibit A16 to Defendants' Reply to Plaintiff's Opposition to Defendants' Second Motion for Summary Judgment).  S.J. was released on parole on August 24, 2004.  (Doc. # 24, Affidavit of Rita Colvin attached as Exhibit B to Defendants' First Motion for Summary Judgment; Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 10 attached as Exhibit A16 to Defendants' Reply to Plaintiffs' Opposition to Defendants' Second Motion for Summary Judgment).

### 3. *Plaintiff D.B.*

Plaintiff D.B. is and has been incarcerated at Scioto Juvenile Correctional Facility since July 2003, though she was released briefly on parole from May 31, 2004 through July 12, 2004. (Am. Compl. ¶ 8).  She was placed at Scioto as a result of an adjudication through the juvenile court in Paulding County.  *Id.*  On February 3, 2004, she was physically assaulted by a male JCO who followed her into her room, grabbed her and threw her to the floor.  *Id.*  The JCO pulled D.B.'s arm behind her back and punched it.  *Id.*  D.B. sustained a broken arm, and her head also hit the floor during the assault.  *Id.*  D.B. was required to undergo surgery for her broken arm. *Id.*  She was 16 years old at the time of the incident.  *Id.*

D.B. filed a grievance on February 6, 2004, and requested to speak with an attorney regarding her rights.  *Id.*  Superintendent Morgan informed D.B. that he would secure an attorney for her.  *Id.*   In January 2005, D.B. spoke with Larry Mathews, an attorney on contract with ODYS, regarding her complaints about the conditions of her confinement.  *Id.*  D.B. requested an attorney to assist her in filing a civil action to compensate her for her injuries, and

to ensure that the JCO who assaulted her would not be working around her. *Id.* In the Amended Complaint, D.B. claims that she was not provided an attorney. *Id.*

After the Amended Complaint was filed, however, ODYS arranged for D.B. to speak to another attorney to discuss her issues related to her conditions of confinement. (Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 16 attached as Exhibit A16 to Defendants' Reply to Plaintiffs' Opposition to Defendants' Second Motion for Summary Judgment). ODYS referred D.B.'s claim to Attorney Kimberly Fulkerson, who has filed suit on behalf of D.B. in the Ohio Court of Claims in Case No. C2005-06023. (Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(d) attached as Exhibit C to Defendants' Third Motion for Summary Judgment).

### 4. *Plaintiff M.M.*

Plaintiff M.M. is an 18-year-old youth who was incarcerated at the Marion Juvenile Correctional Facility as a result of an adjudication from Youngstown, Ohio. (Am. Compl. ¶ 10). In October 2004, M.M. was involved in an incident upon his return from the bathroom, wherein he was pushed by a JCO, hit in the head, and then slammed to the ground. *Id.* One of his hands was placed in a handcuff and the JCO kneeled on M.M.'s uncuffed hand to prevent him from moving it until it could be placed in the handcuff. *Id.* The JCO placed his arm around M.M.'s neck while he was on the ground causing M.M. to gag and eventually black out. *Id.* When M.M. regained consciousness he was kicked in the jaw twice by the JCO. *Id.* M.M. experienced significant pain and was unable to eat solid food for over a week after the incident. *Id.* Additionally, the JCO who choked M.M. told him that if he did not report the incident, the JCO would bring him contraband items such as chewing tobacco and cigars. *Id.*

-7-

On October 16, 2004, M.M. filed a grievance regarding this incident, and requested that the matter be resolved "in court." *Id.* Superintendent Norm Hills informed M.M. that there was no basis for his allegations. *Id.* M.M. appealed this decision to the chief inspector. *Id.* He attached a statement requesting an attorney to assist him in securing appropriate medical care, and proper treatment in the facility. *Id.* ODYS contract attorney Larry Mathews contacted M.M. about his request for an attorney. *Id.* At the time the Amended Complaint was filed, however, M.M. had not yet been assigned an attorney for his underlying conditions of confinement complaints. *Id.*

Since then, ODYS contract attorney, Sharon Hicks, helped M.M. prepare a *pro se* complaint with an affidavit of indigency and motion for appointment of counsel. (Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(e) attached as Exhibit C to Defendants' Third Motion for Summary Judgment). That case was dismissed without prejudice based on new Sixth Circuit law. *Id.* In a supplement to their Third Motion for Summary Judgment, Defendants introduce evidence that M.M.'s conditions of confinement case has been re-filed and is currently pending in the United States District Court for the Northern District of Ohio, Case Number 3:05-CV-07362. (Doc. #100, Affidavit of J. Gregory Glasgow attached as Exhibit A-1). M.M.'s attorney of record is ODYS contract attorney, Sharon Hicks. *Id.* M.M. was released from custody on April 3, 2005. (Doc. #89, Affidavit of Rhonda Richard at ¶ 8(e) attached as Exhibit C to Defendants' Third Motion for Summary Judgment).

### 5.    *Plaintiff T.M*

Plaintiff T.M. is an 18-year-old youth who was in the custody of ODYS for approximately two years at Marion Juvenile Correctional Facility. (Am. Compl. ¶ 11). In

October 2004, during an incident involving T.M. and other youth who were banging on doors to get permission to use the bathroom, a JCO came into his room, restrained him, "choking him out" until T.M. was rendered unconscious.  *Id.*  During the incident, T.M. was also hit in the eye by the JCO and, as a result, he sustained an eye injury.  *Id.*

On October 16, 2004, T.M. filed a grievance regarding this incident.  *Id.*  T.M.'s grievance included a written statement in which he described the assault by the JCO, and he asserted that youth were being forced to urinate in their rooms into rubber gloves rather than being able to use the bathroom.  *Id.*  T.M. indicated that he wanted his grievance resolved "in court."  *Id.*  On December 15, 2004, T.M. sent his grievance to the chief inspector because he believed that he had not received appropriate information or relief from Superintendent Hills.  *Id.*  T.M. met with ODYS contract attorney Larry Mathews and asked for an attorney to file a civil claim for damages, to seek better medical care, and to learn about his rights.  *Id.*

Since then, ODYS contract attorney Sharon Hicks wrote a letter to T.M. informing him that she had spoken to attorney Matthew Brownfield on his behalf and that Mr. Brownfield had agreed to meet with him to evaluate his conditions of confinement claims.  (Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(f) attached as Exhibit C to Defendants' Third Motion for Summary Judgment).  T.M. has not responded to Ms. Hicks' letter.  *Id.*  In addition, T.M.'s building administrator, Scott Moore, asked T.M. if he would meet again with Attorney Mathews on March 14, 2005.  (Doc. # 89, Affidavit of Scott Moore at ¶ 3 attached as Exhibit C-4 to Defendants' Third Motion for Summary Judgement).  T.M indicated to Mr. Moore that he did not want to meet with Attorney Mathews.  *Id.*  T.M. was released from custody on June 1, 2005.  (Doc. # 102, Affidavit of Doneta Riegsecker at ¶ 5 attached as Exhibit A to Defendants' Motion

for Leave to File their Second Supplemental Memorandum in Support of their Third Motion for Summary Judgment).

**B.     Defendants**

>   *1.      Defendant Bob Taft*

Defendant Bob Taft[3] is the duly elected governor of the State of Ohio, and functions as the head of the State's executive branch.  (Am. Compl. ¶ 12).  Additionally, pursuant to Section 5139.01(B) of the Ohio Revised Code, Governor Taft is statutorily required to appoint a director to head ODYS with the advice and consent of the Ohio Senate.  *Id.*

>   *2.      Defendant Thomas Strickrath*

Defendant Thomas Stickrath is the interim Director of Youth Services, and was appointed to replace Geno Natalucci-Persichetti who, according to Plaintiffs, was forced to resign as Director in December 2004.  (Am. Compl. ¶ 13).  As Director of Youth Services, Mr. Stickrath is vested with the powers of a department head set forth in Chapter 121 of the Ohio Revised Code.  *Id.*   These powers and duties include, but are not limited to, adopting rules for the governance of the department, the conduct of its officers and employees, the performance of its business, and the custody, use and preservation of the department's records and property.  *Id.* Plaintiffs allege that any duties imposed by law on ODYS must be performed by or implemented by the Director. *Id.*

---

[3]On June 2, 2005, Defendant Taft filed a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure requesting that he be dismissed as a party to this action.  (Doc. # 79). Defendant Taft claims that the facts alleged in the Amended Complaint are insufficient to show that he actively participated in the alleged wrongs against Plaintiffs.

### 3.  *Defendant ODYS*

Defendant ODYS operates or funds by contract several community corrections facilities for juveniles committed as juvenile delinquents or serious juvenile offenders, including but not limited to Butler County Juvenile Rehabilitation Center, Hocking Valley Community Residential Center, Juvenile Residential Center of Northwest Ohio, Lucas County Youth Treatment Center, North Central Ohio Rehabilitation Center, Oakview Group Home, Perry County Group Home and West Central Juvenile Rehabilitation Facility.  (Am. Compl. ¶ 18).  A community corrections facility is a county or multi-county rehabilitation center for felony delinquents committed to ODYS.  Some felony delinquents are placed in the community corrections facilities instead of being placed in an institution.  *Id.*

ODYS operates or funds by contract several institutions, including but not limited to Circleville Youth Center, Cuyahoga Hills Boys School, Indian River School, Marion Juvenile Correctional Center, Maumee Youth Center, Mohican Youth Center, Ohio River Valley Youth Center, Scioto Juvenile Correctional Center and Lighthouse Youth Center at Paint Creek.  (Am. Compl. ¶ 19).  These institutions are state facilities created by the Ohio General Assembly under the management and control of ODYS or a private entity with which ODYS contracted for institutional care and custody of felony delinquents.  *Id.*  In addition to maintaining these facilities, ODYS supervises committed juveniles housed in institutions or community corrections facilities throughout the State of Ohio.  (Am. Compl. ¶ 20).

Juveniles who are adjudicated delinquent for committing acts that if committed by an adult would constitute felonies may be committed to ODYS for an indefinite period of time up to and until the juvenile reaches the age of 21.  (Am. Compl. ¶ 21).  Juveniles who have been

adjudicated felony delinquents are eligible for placement at community corrections facilities. (Am. Compl. ¶ 22). A felony delinquent is a juvenile at least 12 years of age, and less than 18 years of age, who had been adjudicated a delinquent juvenile for committing an act that if committed by an adult would be a felony offense, or an adult between the ages of 18 and 21 who is in the legal custody of ODYS, and has committed an act while in custody that would constitute a felony if committed by an adult. *Id.*

Juveniles committed to ODYS range in age from 12 to 21 years. (Am. Compl. ¶ 23). Placement in an institution or community corrections facility generally ranges from several months to several years. *Id.* The average age of admission in Ohio is 15.9 years. *Id.*

According to Plaintiffs, Defendants presently provide no adequate, effective, and meaningful system for committed juveniles who are placed in institutions or community corrections facilities to gain access to the courts for matters related to the fact, duration,[4] or conditions of confinement that may violate their federal statutory or constitutional rights. (Am. Compl. ¶ 26). Plaintiffs assert that the only legal representation presently provided for indigent committed juveniles is through the Ohio Public Defender's Office. *Id.* The Public Defender has a staff of four attorneys who are responsible for screening juveniles at the Scioto Juvenile Correctional Facility's intake center. (Am. Compl. ¶ 29). These attorneys are available to represent only committed juveniles who elect to pursue direct appeals of their orders of commitment. *Id.*

---

[4]The Court notes that, although Plaintiffs and Defendants each make reference to access to the courts for youth who wish to challenge the fact or duration of confinement, Plaintiffs do not allege that any of the individually-named Plaintiffs were denied access to the courts for this type of challenge. Instead, the individually-named Plaintiffs all claim that they were denied meaningful access to the courts for their conditions of confinement complaints.

Defendants present evidence that the Ohio Public Defender's Office provides legal assistance to youth to address challenges to fact of duration of confinement.  (Doc. # 25, Affidavit of Sara R. Vollmer at ¶ 17 attached as Exhibit A to Defendants' Second Motion for Summary Judgment).  A staff member of the Public Defender's Office is housed at the Scioto Juvenile Correctional Facility, the reception site for both boys and girls being placed into the ODYS system, and conducts orientation meetings with the youth as they enter the system.  *Id.* Attorneys for the Public Defender's Office meet with youth who have requested to speak with an attorney and/or who wish to file a claim concerning the fact or duration of their confinement and draft and file *pro se* appeals on behalf of the youth.  *Id.*  In addition, the Public Defender provides assistance in post-conviction and state habeas actions.  *Id.*

In September 2004, after Plaintiffs had filed this lawsuit, Defendant ODYS hired Attorney Larry Mathews under a temporary contract to "assess the demand for legal services on conditions of confinement issues" and to interview and refer youth to private law firms for legal representation.  (Am. Compl. ¶ 31.)  Notwithstanding this contract, Plaintiffs allege that some of the named Plaintiffs and members of the putative class continue to be denied their constitutional right to access the courts to redress grievances while in ODYS facilities.  *Id.*

Defendants present evidence that ODYS entered into a contract with Attorney Mathews in September 2004, to provide legal assistance to youth with regard to conditions of confinement.  (Doc. # 25, Affidavit of Sara R. Vollmer at ¶ 17 attached as Exhibit A to Defendants' Second Motion for Summary Judgment).  Mr. Mathews travels to each institution on a bi-weekly basis to talk to youth about issues related to conditions of confinement.  *Id.*  Since September 2004, Mr. Mathews has conducted an orientation at each facility with youth and staff

and has met with youth individually and in groups to discuss legal issues and to assist them in filing or resolving grievances. *Id.* In addition, ODYS has hired a youth advocate to act on behalf of the incarcerated juveniles to ensure that their grievances are processed and addressed at all levels. *Id.* ODYS has also hired a Compliance Officer to oversee the implementation of the legal assistance program and all new initiatives directed at improving conditions of confinement. *Id.*

## IV. STANDARD OF REVIEW[5]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[5]Because the Court concludes that Defendants' Motion for Disqualification of Plaintiffs' Counsel is moot and dismisses without prejudice Plaintiffs' Motion for Class Certification, the only standard of review applicable to this Opinion and Order is one for summary judgment.

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations but must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *see Celotex*, 477 U.S. at 324.  Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251;  *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995);  *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be sufficient to survive summary judgment).

## V.  ANALYSIS

In Defendants' First Motion for Summary Judgment, they argue that the Plaintiffs named in the original Complaint failed to exhaust their administrative remedies.  Exhaustion of administrative remedies is a mandatory prerequisite to filing a Section 1983 action.  *Wyatt v. Leonard*, 193 F.3d 876, 879 (6th Cir. 1999).  The requirement that plaintiffs exhaust their administrative remedies, although mandatory, is not a jurisdictional requirement.  *Id.*  In their Second Motion for Summary Judgment, Defendants argue that Plaintiffs lack standing to bring their claims and that the claims of one Plaintiff has been rendered moot.  When a claim has been rendered moot or a plaintiff lacks standing, a federal court is deprived of jurisdiction to hear the

case. *Baker v. Carr*, 369 U.S. 186, 204 (1962); *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992).

Because Defendants' Second Motion for Summary Judgment implicates this Court's jurisdiction, the Court will first consider the issues raised in that motion.

## A.    Defendants' Second Motion for Summary Judgment

Defendants make two arguments in their Second Motion for Summary Judgment.  First, Defendants argue that J.P., S.J. and D.B., the plaintiffs named in the original Complaint, lack standing to assert claims of denial of access to court.  Second, Defendants argue that S.J.'s claims has been rendered moot because she was released on parole on August 24, 2004.

### 1.    Standing

Defendants move for summary judgment against all three Plaintiffs on the basis that none of them can establish standing.  Article III, Section 2 of the United States Constitution confines the jurisdiction of federal courts to the resolution of actual "cases" and "controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *NRA of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). The case or controversy limitation of Article III requires that a party invoking federal jurisdiction has standing -- that is a "personal stake in the outcome" of the action. *Baker v. Carr*, 369 U.S. at 204; *see also Stevenson v. J.C. Bradford & Co.*, 277 F.3d 838, 852-53 (6th Cir. 2002). To establish a personal stake in the outcome of an action, a plaintiff must allege an "injury in fact" to his preexisting, legally protected interest. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).  The injury must be "(a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Id.*; *see also TCG*

-16-

*Detroit v. City of Dearborn*, 206 F.3d 618, 622 (6th Cir. 2000).  A particularized injury is one that "affect[s] the plaintiff in a personal and individual way."  *Lujan*, 504 U.S. at 560 n.1.

In prisoners' denial of access to court cases, an inmate establishes standing by showing that he or she suffered an actual litigation related injury or legal prejudice because of the actions of the defendant.  *See Lewis v. Casey*, 518 U.S. 343, 349-51 (1996) (requiring "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or present a claim").

### a.    **When standing is determined**.

Defendants argue that Plaintiffs have not been prevented from filing suit on their underlying claims and, thus, they have not suffered any actual injury.  Specifically, Defendants present uncontroverted evidence that two Plaintiffs, J.P. and D.B., have filed suit in their underlying conditions of confinement cases and that another named Plaintiff, S.J., could have filed her claim but has declined to do so.  (Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 16 and Affidavit of Rhonda Richard at ¶ 7(a) attached as Exhibit A16 and A17 respectively to Defendants' Reply to Plaintiff's Opposition to Defendants' Second Motion for Summary Judgment; Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(d) attached as Exhibit C to Defendants' Third Motion for Summary Judgment).  Defendants argue that, based on these facts, Plaintiffs lack standing to assert the claims presented in the instant case.  The Court disagrees.

The U.S. Court of Appeals for the Sixth Circuit has held that "standing does not have to be maintained throughout all stages of litigation."  *Cleveland Branch, NAACP v. City of Parma, Ohio*, 263 F.3d 513, 524 (6th Cir. 2001).  "Instead, [standing] is to be determined as of the time the complaint is filed."  *Id.  The Cleveland Branch, NAACP* court exhaustively reviewed United

-17-

States Supreme Court case law and concluded that "'jurisdiction is tested by the facts as they existed when the action [was] brought' and 'that after vesting, it cannot be ousted by subsequent events.'" *Id.* (quoting *Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957)).

Consequently, the fact that three named Plaintiffs have already filed suit or been afforded the means to do so after the initiation of this case is of no moment in a standing analysis. The proper inquiry is whether the Plaintiffs were suffering or had suffered an actual injury because of Defendants' action or inaction at the time the Complaint was filed. Accordingly, the Court will consider Plaintiffs' standing at the time the Complaint was filed.

**b.     Plaintiffs' standing at the time the Complaint was filed**

It is well established that inmates have a constitutionally protected right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1971). The Supreme Court, in its subsequent explanation of *Bounds*, stated that "[i]nsofar as the right vindicated by *Bounds* is concerned, 'meaningful access to the courts is the touchstone,' and the inmate must go one step further and demonstrate is that the alleged shortcomings in the prison library or legal assistance program have hindered, or are presently hindering, his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351 (internal citations omitted). That is, an inmate must show "actual injury." *Id.* at 348-49 (describing as an example of actual injury, an inmate who was unable to meet a filing deadline or to present a claim). In addition, "the injury requirement is not satisfied by just any type of frustrated legal claim." *Id.* at 354. *Bounds* requires that the prison officials provide the tools so that inmates can "file nonfrivolous legal claims challenging their convictions or conditions of confinement." *Id.* at 355-56.

A state need not always provide access to legal counsel to adults to satisfy the constitutional requirement of meaningful access to the courts. Access to a law library may be sufficient. *See Ross v. Moffitt*, 417 U.S. 600 (1974); *see also John L. v Adams*, 969 F.2d 228, 234 (6th Cir. 1992). For juveniles, however, the Sixth Circuit has held that "incarcerated juveniles do have a constitutional right of access to the courts, and that in order to make this right meaningful the State must provide the juveniles with access to an attorney." *John L. v. Adams*, 969 F.2d at 230. The *John L.* court reasoned that incarcerated juveniles "could not make effective use of legal materials" without guidance and would therefore be deprived of their constitutional right to meaningful access to the courts absent the assistance of counsel. *Id.* at 233.

In the case *sub judice*, Plaintiffs allege that they were denied meaningful access to the courts because they were denied access to an attorney to file nonfrivolous legal claims challenging their conditions of confinement.

i. Plaintiffs' nonfrivolous claims

Initially, the Court notes that, although Defendants do not challenge the sufficiency of Plaintiff's conditions of confinement cases, the Court must evaluate, and herein concludes, that all Plaintiffs' underlying claims are "nonfrivolous." *See Lewis*, 518 U.S. at 354 (nonfrivolous claims alleging constitutional violations are proper underlying claims in denial of access to court cases). Each Plaintiff wanted to challenge alleged incidents that seriously affected their conditions of confinement. Allegedly, J.P. was sexually assaulted while on suicide watch, S.J. was physically assaulted resulting in a rupture to her eardrum and D.B. was physically assaulted resulting in a broken arm which required surgery. All three of these juveniles wanted to pursue

-19-

claims under Section 1983 alleging excessive force in violation of the Eighth Amendment to the United States Constitution. "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

ii.     Plaintiffs' access to the courts

Next, the Court assesses the state of Plaintiffs' underlying conditions of confinement claims on July 29, 2004, the date the Complaint was filed.

J.P. "specifically requested legal counsel" from ODYS to assist her in filing a claim related to her sexual assault. (Compl. ¶ 6). Defendants did not provide her with access to an attorney. *Id.* Consequently, it appears that J.P. was being denied meaningful access to file her nonfrivolous claim at the time the Complaint was filed and, thus, did not lack standing to bring this lawsuit.

S.J. "specifically asked for legal assistance from ODYS" to assist her in filing a claim related to her physical assault. (Compl. ¶ 7). S.J. was told "that ODYS could not provide her with an attorney." *Id.* Thus, it appears that S.J. was also being denied meaningful access to file her nonfrivolous claim at the time the Complaint was filed and, therefore, did not lack standing to bring the instant action.

Likewise, D.B. specifically requested "legal assistance" from ODYS to assist her in filing a claim related to her physical assault. (Compl. ¶ 8). Defendants did not provide D.B. with access to an attorney. *Id.* Consequently, it appears that D.B., too, was being denied meaningful access to file her nonfrivolous claim at the time the Complaint was filed and, thus, did not lack standing to bring this lawsuit.

### c.    Conclusion regarding standing

After assessing Plaintiffs' standing at the time the Complaint was filed, and reviewing the facts in the light most favorable to Plaintiffs, the Court concludes that each Plaintiff properly asserted a nonfrivolous underlying claim, which she was allegedly prevented from filing because of officials' denial of requests for legal counsel.  Accordingly, the Court **DENIES** Defendants' motion for summary judgment against J.P., S.J. and D.B. based on lack of standing.

### 2.    *Mootness*

Defendants also move for summary judgment against S.J. on the basis that her claim has been rendered moot.  The Court, however, will evaluate whether any of Plaintiffs' claims have been rendered moot since such a finding would deprive this Court of jurisdiction to hear their claims.  "Questions of jurisdiction, of course, should be given priority -- since if there is no jurisdiction there is no authority to sit in judgment of anything else."  *Vermont Agency of Natural Resources v. United States, ex rel Stevens*, 529 U.S. 765, 778 (2000) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)).  "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  *Id.* at 778-79 (citing *Ex parte McCardle*, 74 U.S. 506, 514 (1869)).

As the Court discussed *supra*, the United States Constitution limits the jurisdiction of this Court to matters that present actual "cases" or "controversies."  U.S. Const. art. III, § 2, cl. 1.  As it relates to the mootness doctrine, this limitation means that if a plaintiff loses standing at any

time during the pendency of the court proceedings, the matter becomes moot,[6] and the court

loses jurisdiction. *See Church of Scientology of California v. United States*, 506 U.S. at 12 ("It

has long been settled that a federal court has no authority to give opinions upon moot questions

or abstract propositions, or to declare principles or rules of law which cannot affect the matter in

issue in the case before it.").

"A case becomes moot 'when the issues presented are no longer live or parties lack a

legally cognizable interest in the outcome.'" *Cleveland Branch, NAACP*, 263 F.3d at 530

(quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "In analyzing issues of

mootness it is helpful to keep in mind that 'these problems often require a highly individualistic,

and usually intuitive, appraisal of the facts of each case.'" *Gottfried v. Medical Planning Servs,

Inc.*, 280 F.3d 684, 690 (6th Cir. 2002) (quoting *McPherson v. Michigan High Sch. Athletic Ass'n*,

119 F.3d 453, 458 (6th Cir. 1997) (Moore, J., dissenting)).

Plaintiffs allege that they were prevented from obtaining meaningful access to the courts

because Defendants did not provide them with access to legal counsel. Plaintiffs request

---

[6] Explaining the difference between standing and mootness, the Sixth Circuit stated: "In essence, standing concerns only whether a plaintiff has a viable claim that a defendant's unlawful conduct 'was occurring at the time the complaint was filed,' while mootness addresses whether that plaintiff continues to have an interest in the outcome of the litigation" *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d at 525 (internal citations omitted). The Supreme Court has repeatedly described mootness

> as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."

*See, e.g., Friends of Earth, Inc. v Laidlaw Envtl. Servs*, 528 U.S. 167, 212 (2000); *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396-97 (1980)

declaratory and injunctive relief, asking the Court to declare that Defendants' actions were unconstitutional and to require Defendants to provide them with access to attorneys. After this case was filed, however, Defendants did in fact provide counsel to each of the three Plaintiffs named in the original Complaint. (Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 16 and Affidavit of Rhonda Richard at ¶ 7(a) attached as Exhibit A16 and Exhibit A17, respectively, to Defendants' Reply to Plaintiff's Opposition to Defendants' Second Motion for Summary Judgment; Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(d) attached as Exhibit C to Defendants' Third Motion for Summary Judgment). Thus, Defendants voluntarily ceased their allegedly unconstitutional actions, *i.e.*, preventing meaningful access to the courts by denying Plaintiffs access to legal counsel.

### a. Defendants' voluntary cessation

There are specific guidelines for this Court to follow when determining whether a plaintiff's controversy remains live or a plaintiff maintains a legally cognizable interest in the outcome of the case when a defendant voluntarily ceases the alleged wrongful behavior giving rise to the suit.[7] "[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.'"

_____

[7]The doctrine related to the voluntary cessation of a defendant's allegedly wrongful behavior is similar to the "capable of repetition yet evading review doctrine" which is applied outside of the voluntary cessation context. Both the voluntary cessation doctrine and the capable of repetition yet evading review doctrine are often referred to as "exceptions" to the mootness doctrine. *See Boston Teachers Union, Local 66, AFT, AFL-CIO v. Edgar*, 787 F.2d 12, 16 (6th Cir. 1986) (referring to the voluntary cessation doctrine as an exception to the mootness doctrine); *see also Gottfried v. Medical Planning Servs, Inc.*, 280 F.3d 684, 693 (6th Cir. 2002) ) (referring to the capable of repetition yet evading review doctrine as an exception to the mootness doctrine).

*Davis*, 440 U.S. at 631 (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)).

The Sixth Circuit has explained the standard applied in voluntary cessation cases as follows:

> A case may be mooted by a defendant's voluntary conduct only "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,' *Friends of the Earth*, 528 U.S. [167,] 189 [(2000)] (quoting *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968)), and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).  The heavy burden of demonstrating mootness rests on the party claiming mootness. *Friends of the Earth*, 528 U.S. at 189.

*Ammex, Inc. v.* Cox, 351 F.3d 697, 704-05 (6th Cir. 2003).  This rule is meant to protect a party from an opponent who seeks to defeat judicial review by temporarily altering its behavior. *See City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) (citations omitted).

There is, however, a "difference in the way voluntary cessation of illegal activities is treated when the offending parties are government officials rather than private parties." *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990).

> [C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties. According to one commentator, such self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine. *See* 13A Wright, Miller & Cooper Federal Practice and Procedure § 3533.7, at 353 (2d ed. 1984).

*Id*.

With regard to voluntary cessation cases, the Supreme Court recently explained that the "underlying concern is that, when the challenged conduct ceases such that 'there is no reasonable expectation that the wrong will be repeated,' *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953), then it becomes impossible for the court to grant 'any effectual relief whatever' to [the] prevailing party,'" *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citing *Church of Scientology of Cal. v. United States*, 506 U.S. at 12 (quoting *Mills v. Green*, 159 U.S. 651, 653

-24-

(1895)).  "In that case, any opinion as to the legality of the challenged action would be advisory."  *Id.*

Accordingly, the Court will analyze whether it is clear that Defendants' allegedly unconstitutional actions are "not reasonably likely to recur" against the named Plaintiffs and whether the "interim relief" provided by Defendants has "completely and irrevocably eradicated the effects of the alleged violation" against the named Plaintiffs so that this Court could not "grant any effectual relief whatever" to Plaintiffs.

i.        Likely recurrence

Defendants have provided uncontroverted evidence establishing that J.P. and S.J. have been released from the ODYS correctional facility.  (Doc. # 24, Affidavit of Rita Colvin attached as Exhibit B to Defendants' First Motion for Summary Judgment;  Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 10 attached as Exhibit A16 to Defendants' Reply to Plaintiffs' Opposition to Defendants' Second Motion for Summary Judgment;  Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(a) attached as Exhibit C to Defendants' Third Motion for Summary Judgment).  Once an inmate is released from incarceration, this Court cannot assume that she will be incarcerated again in the future.  *See e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983);  *O'Shea v. Littleton*, 414 U.S. 488, 493-96 (1974);  *see also Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (a prisoner's claims for injunctive relief become moot when the prisoner is no longer incarcerated);  *Mezo v. Taylor*, Case No. 93-5672, 1993 U.S. App. LEXIS 32954, *2-3 (6th Cir. December 15, 1993) ("Mezo is no longer incarcerated at DCDC, and there has been no showing of a reasonable expectation that he will again be a prisoner in that facility.  His claims for declaratory and injunctive relief are therefore moot").

-25-

Consequently, the Court concludes that Defendants have met their burden of showing that there is no reasonable expectation that the denial of access to an attorney will reoccur with regard to J.P. and S.J., since they are no longer under the control of Defendants.

D.B., however, remains incarcerated. (Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 16 attached as Exhibit A16 to Defendants' Reply to Plaintiffs' Opposition to Defendants' Second Motion for Summary Judgment).  Defendants bear the heavy burden to show that voluntary cessation of their allegedly unconstitutional behavior is not reasonably likely to recur; the Court concludes that Defendants have carried that burden in this case.

Initially, the Court finds it significant that all the Plaintiffs  named in the Complaint and the Amended Complaint have now been provided access to attorneys.  (Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 16 and Affidavit of Rhonda Richard at ¶ 7(a) attached as Exhibit A16 and Exhibit A17 respectively to Defendants' Reply to Plaintiff's Opposition to Defendants' Second Motion for Summary Judgment;  Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(d) attached as Exhibit C to Defendants' Third Motion for Summary Judgment).  Yet, were this the only fact in support of Defendants' motion, it would not at all be clear whether Defendants' actions were meant only to defeat judicial review by "temporarily altering questionable behavior." *City News & Novelty, Inc. v City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc*., 484 U.S. 49, 66-67 (1987)).  That is not the situation before this Court, however.  Instead, Defendants have made significant changes to their legal assistance policy that will affect all juveniles incarcerated in facilities operated by ODYS.

Specifically, Defendants present uncontroverted evidence that ODYS entered into a contract with attorney Larry Matthews in September 2004, approximately one year ago, to

provide legal assistance to youth with regard to conditions of confinement. (Doc. # 25, Affidavit of Sara R. Vollmer at ¶ 17 attached as Exhibit A to Defendants' Second Motion for Summary Judgement). Mr. Mathews travels to each institution on a bi-weekly basis to talk to the inmates about issues related to conditions of their confinement. *Id.* Since September, Mr. Mathews has conducted an orientation at each facility with youth and staff and has met with youth individually and in groups to discuss legal issues and to assist them in filing or resolving grievances. *Id.* In addition, ODYS has hired at least one other contract attorney, Sharon Hicks, who is currently representing M.M. on her underlying conditions of confinement case. (Doc. #100, Affidavit of J. Gregory Glasgow attached as Exhibit A-1).

Further, ODYS has hired a youth advocate to act on behalf of the youths to ensure that their grievances are processed and addressed at all levels. (Doc. # 25, Affidavit of Sara R. Vollmer at ¶ 17 attached as Exhibit A to Defendants' Second Motion for Summary Judgement). Finally, ODYS has also hired a Compliance Officer to oversee the implementation of the legal assistance program and all new initiatives directed at improving conditions of confinement. *Id.*

Plaintiffs offer no evidence in their Memorandum in Opposition to Defendants' Second Motion for Summary Judgment that would tend to show that the changes made to the legal assistance program are in any manner deficient.

Moreover, the Sixth Circuit requires that this Court treat the "cessation of the allegedly illegal conduct by government officials" with "more solicitude" than similar action by private parties, so long as their cessation appears genuine. *Hairston*, 920 F.2d at 415 ("such self-correction provides a secure foundation for dismissal based on mootness so long as it appears genuine") (citation omitted). The uncontroverted evidence in the instant case leads this Court to

conclude that Defendants' voluntary cessation of the former policies and practices is in fact genuine. Defendants admit that their denial of access to legal counsel was an error: In his affidavit Superintendent Morgan states that his denial of juveniles' request for legal counsel was the result of his inadvertent ignorance of the *John L.* mandate requiring prison officials to provide attorneys to incarcerated juveniles. (Doc. # 24, Affidavit of John Morgan).

Superintendent Morgan further avers that:

> Prior to my employment with the Ohio Department of Youth Services (DYS), I was employed by the Ohio Department of Rehabilitation and Correction, Ohio's adult correctional system, for approximately 32 years.
>
> In the adult correctional system, the state provides libraries and not attorneys as the method of legal assistance to incarcerated persons.
>
> I was not aware that the legal assistance provided to juvenile offenders by the state is attorneys.

*Id.* at ¶¶ 3-5.

The Court does not believe that ignorance of the law in any way excuses Superintendent Morgan's actions and the Court certainly does not condone ODYS's failure to train its superintendents properly. That being said, this Court must nevertheless determine whether Defendants' cessation of their denials of access to attorneys for juveniles is genuine. *See Hairston*, 920 F.2d at 415. Superintendent Morgan's affidavit supports the conclusion that Defendants' actions are genuinely meant to remedy their alleged wrongful conduct. The uncontroverted evidence establishes that the significantly improved legal assistance program was implemented to correct Defendants' previous actions and not simply to evade judicial review by temporarily changing their behavior.

Moreover, the Supreme Court has cautioned that appropriate deference must be shown to the judgment of prison officials. In *Lewis v. Casey*, that Court concluded that the "District Court here failed to accord adequate deference to the judgment of the prison authorities in at least three significant respects." *Lewis*, 518 U.S. at 361. Two of those respects guide this Court's determination in the instant case. First, the *Lewis* court found that the injunction imposed by the district court enmeshed that Court – to an unwarranted degree – "in the minutiae of prison operations.'" *Id.* at 362 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)). In the context of denial of access to courts claims, "[i]t is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur." *Id.* at 349.

In the instant case, since Plaintiffs seek only declaratory and injunctive relief, this Court is not called upon to remedy instances of prior denials of the right of access to legal counsel; only a claim for monetary damages can remedy such injuries. Thus, the Court must accord deference to the prison authorities' apparently sufficient attempts to presently remedy their previous alleged actions.

Second, the *Lewis* court disapproved the district court's injunction against the prison because it "was developed through a process that failed to give adequate consideration to the views of state prison authorities." *Id.* ("the strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors . . . also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.") (citing *Preiser v. Rodriguez*, 411 U.S. 475, 492 (1973)).

Instead, the *Lewis* court contrasted the improper relief rendered in *Lewis* with that rendered in

*Bounds*:

> For an illustration of the proper procedure in a case such as this, we need look no further than *Bounds* itself. There, after granting summary judgment for the inmates, the District Court refrained from "'dictating precisely what course the State should follow.'" *Bounds*, 430 U.S. at 818. Rather, recognizing that "determining the 'appropriate relief to be ordered . . . presents a difficult problem,'" the court "'charged the Department of Correction with the task of devising a Constitutionally sound program' to assure inmate access to the courts." *Id.*, at 818-819. The State responded with a proposal, which the District Court ultimately approved with minor changes, after considering objections raised by the inmates. *Id.*, at 819-820. We praised this procedure, observing that the court had "scrupulously respected the limits on [its] role," by "not . . . thrusting itself into prison administration" and instead permitting "prison administrators [to] exercise wide discretion within the bounds of constitutional requirements." *Id.*, at 832-833.

*Id.* at 362-63.

In the case *sub judice*, unlike in *Bounds*, prison administrators have already devised a

program intended to assure that incarcerated juveniles have meaningful access to the courts.

Thus, Lewis teaches that this Court must scrupulously respect the limits on its role by not

thrusting itself into prison administration and, instead, permitting prison administrators the

discretion to provide meaningful access to the courts for the incarcerated juveniles through its

newly-implemented legal assistance program.

Accordingly, this Court concludes that Defendants have met their burden of establishing

that their actions "made it absolutely clear that the allegedly wrongful behavior could not

reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189; *see also Preiser v.*

*Newkirk*, 422 U.S. 395 (1975) (holding that there was no reasonable basis for expecting that

the wrong would be repeated when the actions challenged by the prisoner were no longer in

-30-

effect, making the prisoner's fears "remote and speculative"); *Weeks v. Chaboudy*, 984 F.2d 185, 190 (6th Cir. 1993) (holding that there was "no reasonable expectation that the wrong will be repeated," and the injunction is therefore improper because "prison personnel have already demonstrated a willingness to provide medical care consistent with this opinion"); *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (holding that the actions of the state and federal defendants since the time the lawsuit was initiated "demonstrated that there is no reasonable likelihood 'that the wrong will be repeated'").

ii.     Interim relief or events eradicating effects

After Plaintiffs initiated this lawsuit, Defendants significantly altered the ODYS legal assistance program. Defendants have provided uncontroverted evidence that, by this new program, all the named Plaintiffs have been provided access to attorneys for the purpose of pursuing claims related to conditions of their confinement in the ODYS juvenile correction facilities. (Doc. # 56, Affidavit of Sara R. Vollmer at ¶ 16 and Affidavit of Rhonda Richard at ¶ 7(a) attached as Exhibit A16 and Exhibit A17 respectively to Defendants' Reply to Plaintiff's Opposition to Defendants' Second Motion for Summary Judgment; Doc. # 89, Affidavit of Rhonda Richard at ¶ 8(d) attached as Exhibit C to Defendants' Third Motion for Summary Judgment).

Moreover, the Supreme Court has explained that, in prison contexts, "'we encourage local experimentation' in various methods of assuring access to the courts." *Lewis*, 518 U.S. at 352 (suggesting as an example in adult prisons the replacing of law "libraries with some minimal access to legal advice and a system of court-provided forms") (citations omitted). The *Lewis* court went on to state:

> We hardly think that what we meant by "experimenting" with such an alternative was simply announcing it, whereupon suit would immediately lie to declare it theoretically inadequate and bring the experiment to a close. We think we envisioned, instead, that the new program would remain in place at least until some inmate could demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded.

*Id.* at 352-53.

As this Court found *supra*, Defendants have not only made a genuine effort to provide the named Plaintiffs with access to attorneys for the purpose of addressing conditions of confinement, they have significantly altered their existing legal assistance program so that it will address these issues with all incarcerated juveniles. The Court will not bring this experiment to a close based on some theoretical speculative inadequacy.

Consequently, the Court concludes that Defendants have met their burden of showing that the interim relief provided through the legal assistance program has irrevocably eradicated the effects of their earlier alleged denial of access to attorneys on the part of J.P., S.J. and D.B.

### iii. Redressability

Plaintiffs ask only for declaratory and injunctive relief. Because the Court concludes that Defendants' allegedly unconstitutional actions are not reasonably likely to recur and that the interim relief provided by Defendants have irrevocably eradicated the effects of their alleged unconstitutional behavior, this Court is unable "grant any effectual relief whatever" to Plaintiffs J.P., S.J. and D.B. *City of Erie v. Pap's A.M.*, 529 U.S. at 287.

Further, in order to provide on a claim for future injunctive relief, a plaintiff must also demonstrate that she is in "real and immediate" danger of sustaining future, direct injury as a result of official conduct ongoing at the time of the suit. *City of Los Angeles v. Lyons*, 461 U.S. at 102. "Federal courts do not, as a rule, enjoin conduct which has been discontinued with no

real prospect that it will be repeated." *Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th Cir.

1988). This Court concludes that there is simply no real and immediate danger that the three

Plaintiffs whose claims are addressed in Defendants' Second Motion for Summary Judgment

will sustain future, direct injury as a result of Defendants' previous allegedly unconstitutional

actions. Quite the contrary, these Plaintiffs are not, by reason of Defendants' significant changes

to their legal assistance program, in immediate danger of sustaining future injury; nor is there

any real prospect that Defendants will not continue to provide incarcerated juveniles access to

counsel through this program                     .

Finally, with regard to Plaintiffs' request for declaratory relief, the Sixth Circuit has

previously recognized that declaratory judgment actions "often require courts to face the difficult

task of distinguishing 'between actual controversies and attempts to obtain advisory opinions on

the basis of hypothetical controversies.'" *Coalition for Gov't Procurement v. Fed. Prison Indus.,*

*Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (citations omitted). In *Ohio Democratic Party v.*

*Blackwell*, this Court explained that

> [w]hile there is no "bright-line" test that assists courts in determining whether a
> party seeks a declaratory judgment premised on an actual controversy, and not an
> advisory opinion, the Supreme Court provides guidance. *TCI/TKR Cable of N.*
> *Ky. v. Johnson*, 30 Fed. Appx. 581 (6th Cir. 2002). The Supreme Court has held
> that when courts consider the mootness doctrine within the context of a claim for
> declaratory relief, "the question is whether the facts alleged, under all the
> circumstances, show that there is a substantial controversy, between parties
> having adverse legal interests, of sufficient immediacy and reality to warrant the
> issuance of a declaratory judgment." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S.
> 115 (1974) (internal quotation marks and citation omitted); *see Coalition for*
> *Gov't Procurement*, 365 F.3d at 459 (citing *McCorkle* with approval) (citation
> omitted). Such a controversy "must be definite and concrete" and it must provide
> for "specific relief through a decree of a conclusive character, as distinguished
> from an opinion advising what the law would be upon a hypothetical set of facts."
> *Johnson*, 30 Fed. Appx. 581 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S.

-33-

227, 240-41, 81 L. Ed. 617, 57 S. Ct. 461 (1937)) (internal quotation marks omitted).

*Blackwell*, 2005 U.S. Dist. LEXIS 18126, * 23-24 (S.D. Ohio August 26, 2005) (finding that "[b]ecause Plaintiff is no longer challenging the ratio of voting machines to registered voters in this action, there does not appear to be an actual controversy of 'sufficient immediacy and reality' warranting this Court's issuance of a declaratory judgment in favor of the State."). Similarly, this Court concludes that, in the instant case, because Plaintiffs J.P., S.J. and D.B. have been provided counsel, there does not appear to be an actual controversy of sufficient immediacy and reality warranting the Court's issuance of declaratory judgment in favor of these Plaintiffs. Therefore, the issuance of a declaration from this Court regarding what the law would be if Defendants had not implemented a program providing the assistance of counsel to the incarcerated juveniles would be nothing more than advisory. This Court is prohibited from issuing such advisory opinions. *Coalition for Gov't Procurement*, 365 F.3d at 458.

### b. Conclusion regarding mootness

After an individualized appraisal of the claims, and reviewing the facts in the light most favorable to Plaintiffs, the Court holds that the claims asserted by Plaintiffs J.P., S.J. and D.B. have been rendered moot. It is clear that Defendants' denial of access to legal counsel cannot recur with regard to J.P. and S.J., who have been released; Defendants' initial denial of D.B.'s request for an attorney is not reasonably likely to recur and Defendants' actions in providing counsel to D.B. has eradicated the effects of their earlier, allegedly unlawful behavior, *i.e.*, D.B.'s attorney has filed suit on her underlying conditions of confinement claim. Consequently, this Court cannot "grant any effectual relief whatever" to Plaintiffs. *City of Erie v. Pap's A.M.*, 529 U.S. at 287.

Accordingly, the Court **GRANTS** summary judgment to Defendants with regard to J.P., S.J. and D.B. because their claims have been rendered moot.

**B.     Defendants' First Motion for Summary Judgment**

In Defendants' First Motion for Summary Judgment, they argue that Plaintiffs failed to exhaust their administrative remedies and, thus, they cannot pursue the claims asserted in this action.  Because the Court concludes, for the reasons stated *supra*, that it lacks subject matter jurisdiction over the claims addressed in Defendants' First Motion for Summary Judgment, that motion is also moot.

Accordingly, the Court **DENIES** as moot Defendants' First Motion for Summary Judgment.

**C.     Defendants' Motion to Disqualify Kim Brooks Tandy as Counsel for Plaintiffs**

Defendants' Motion to Disqualify Plaintiffs' Counsel is directed to an affidavit filed in support of Plaintiffs' Memorandum in Opposition to Defendants' Second Motion for Summary Judgment.  Defendants argue that Attorney Tandy filed substantive testimony with the Court in this affidavit and, therefore, has caused herself to become a material witness in this case.  The Court, however, has resolved Defendants' Second Motion for Summary Judgment without reference to Attorney Tandy's affidavit.

Accordingly, the Court **DENIES** as moot Defendants' Motion to Disqualify Kim Brooks Tandy as Counsel for Plaintiffs.

**D.      Defendants' Motion for Class Certification**

Although the Court recognizes that Defendants' Third Motion for Summary Judgment has not been fully briefed, the foregoing analysis raises serious issues regarding the claims of the remaining two named Plaintiffs, T.M. and M.M, related to standing and mootness.  This Court cannot certify a putative class unless an individually-named plaintiff has a valid claim before it. *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (absent an exception to mootness, a plaintiff who had standing to bring a claim must retain a live claim before the court at the time of class certification) (citations omitted).

The Court notes , however, that the issue of whether Defendants' allegedly unconstitutional behavior (denying incarcerated juveniles access to legal counsel to bring nonfrivolous conditions of confinement lawsuits) will again be before this Court once Defendants' Third Motion for Summary Judgment is fully briefed.  Although the Court expresses no opinion as to the final resolution of that motion, the evidence presently before the Court casts serious doubt on the availability of any suitable class representative, whether they be the two remaining named Plaintiffs, T.M. and M.M., or any other juveniles currently in the custody of ODYS.  Consequently, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' Motion for Class Certification.  Should any claims survive resolution of Defendants' Third Motion for Summary Judgment, the Court expresses its willingness to re-visit the issue of class certification.  **VI.       CONCLUSION**

Based on the foregoing, the Court **GRANTS** Defendants' Second Motion for Summary Judgment based on this Court's lack of subject matter jurisdiction to entertain the claims asserted by the Plaintiffs named in the Complaint.  (Doc. # 24).  The Court **DENIES** as moot Defendants'

First Motion for Summary Judgment (Doc. # 25), and **DENIES** as moot Defendants' Motion to

Disqualify Kim Brooks Tandy as Counsel for Plaintiffs (Doc. # 51).  Finally, the Court

**DISMISSES** Plaintiffs' Motion for Class Certification **(Doc. #6), WITHOUT PREJUDICE** to

re-filing, if otherwise appropriate, following resolution of Defendants' Third Motion for

Summary Judgment.

       **IT IS SO ORDERED.**


DATED: September 29, 2005                      ___s/Algenon L. Marbley_____
                                            ALGENON L. MARBLEY
                                            UNITED STATES DISTRICT JUDGE