# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| J.P. a minor child and all others | : | |
| similarly situated, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| | : | Case No. 2:04-CV- 692 |
| | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| | : | |
| BOB TAFT, et al., | : | |
| | : | |
| Defendants. | : | |

## THIRD REPORT OF THE MONITOR ON THE LEGAL ASSISTANCE PROGRAM

I.      Introduction

        I filed the *Second Report of the Monitor on the Legal Assistance Program* on June 4,

2009.   Doc. Nos. 240, 241, 242.  Pursuant to the Court's subsequent order, both parties in this

cause filed responses to that report.  While the parties did not object to my findings or

recommendations, both the plaintiffs' and defendants' counsel identified several concerns to

which the Court responded (Doc. No. 246).  In his order confirming the *Second Report,* Judge

Marbley addressed the parties' concerns and directed me to file an interim report by August 15,

2009 to address the status of the Legal Assistance Program's (LAP) backlog and non-backlog

caseloads.[1]  This report addresses these two issues and their implications for the professional staffing level of the LAP.  In addition, I shall discuss the progress I have observed regarding the LAP's requests for documents and the Department of Youth Services' (DYS) responses thereto. I shall not endeavor at this time to evaluate the Recommendations for Action I described in the *Second Report.*

As was the case with respect to the *First* and *Second Reports*, James Holzhauer, a former graduate assistant who earned his Master of Arts degree in Criminal Justice at the University of Toledo, has worked with me on all phases of monitorship.  Mr. Holzhauer was responsible for developing the data base for this report and is its primary author.  I reviewed the data Mr. Holzhauer developed and reviewed carefully earlier drafts and contributed to this final work product.  Thus, I am solely responsible for the contents of the report.  In the interest of simplicity, all references to "I" or "we" throughout this report refer to the monitor, Mr. Holzhauer, or both of us.

II.    Methodology

During June 2009 I exchanged a series of emails with plaintiffs' counsel regarding some of the questions and concerns they had regarding the LAP's caseload as reflected in the *Second Report* and the implications of that caseload on my recommendation regarding the professional staffing level of the LAP.[2]  The substance of plaintiffs' concerns, together with the Court's order,

---

[1]   Backlog matters are those complaints contained in Sharon Hicks' files that youth brought to the LAP between July 1, 2007 and January 31, 2008, as well as any additional matters to which LAP attorneys assigned a backlog case number.  I discuss this topic in greater detail in the *Second Report.  Second Report* at 13-15 and 42-44.  Non-backlog matters are those complaints that youth have brought to the LAP since July 1, 2008.

[2]   I concluded that report with a recommendation that "(t)he revised RFP should require the contracting LAP attorney to make available at least 2.5 lawyers (defined as 30 hours per week per attorney) and, if, necessary up to 3.0 lawyers, similarly defined, for a total of up to 75 to 90 billable hours per week."  See *Second Report*, 11th Recommendation, at 50.

Third Report of the Court Monitor
August 14, 2009
Page 2

provided the impetus for this report.  In addition, on June 12, 2009 we met with Kelly Castle, Brenda Cronin, Sara Vollmer, and Richard Cholar[3] to hear and discuss the DYS's concerns about the document request process, as well as their ideas for improving that process.

On July 8, 2009, we met with the LAP attorneys (Stacy Hinners, Emma Seta, and Greg Kevan) at the offices of the Mezibov firm in Cincinnati.  During this meeting we discussed the LAP attorneys' assessment of DYS's responses to LAP document requests, as well as some of the concerns DYS had brought to our attention.  We also asked the LAP attorneys to prepare several documents regarding the status of their backlog and non-backlog cases and their thoughts on ways in which the parties could improve the efficiency of the LAP.

III.   LAP Requests for Documents

In the *Second Report* I discussed DYS's implementation of a new procedure for addressing requests for records from the LAP.  *Second Report* at 19-21.  The DYS agreed to provide copies of specific documents in response to formal requests made by LAP attorneys.[4] On July 28, 2009, I received an updated status report on DYS's responses to document requests from LAP attorneys.  The cooperation between the DYS and the LAP following the implementation of DYS's new procedure for responding to requests has resulted in the near

---

[3]   Kelly Castle, Esq. serves as Chief Legal Counsel to the DYS; Brenda Cronin is the Executive Assistant to the Director of the DYS; Sara Vollmer, Esq. is an attorney with the DYS Division of Legal Services; and Richard Cholar, Jr., Esq. is an Assistant Attorney General in the Criminal Justice Section of the Ohio Attorney General's office.

[4]   These documents include the following: 1) copies of the incident report and any attachments; 2) copies of the investigation report and any attachments; 3) access to video if it is attached to the investigation; and 4) copies of any grievances filed by the youth related to the incident.

complete resolution of the "backlogged" requests and has produced highly favorable results thus far in the area of "current" requests.[5]

Between July 1, 2008 and March 27, 2009, LAP attorneys submitted a total of 219 requests for documents to which DYS had not previously responded.[6]  As of July 28, DYS had fulfilled 214 of these requests in their entirety.[7]  Of the remaining requests, the LAP placed one request on hold and DYS had provided the initial documents in four cases.  In those four cases, DYS will be able to fulfill the LAP's requests – one Special Management Plan and three medical records – upon receiving the requested documents from a facility.  *Memo from Sara Vollmer to Vince Nathan, Jim Holzhauer, Kelly Castle, and Brenda Cronin,* July 28, 2009.

Since March 30, LAP attorneys have submitted a total of 78 requests for records.  LAP attorneys submitted 34 of these 78 requests between March 30 and April 30.   DYS has fulfilled each of the 34 requests in their entirety.  LAP attorneys submitted eight requests for records between May 1 and May 31.  DYS has fulfilled seven of the eight requests in their entirety and partially fulfilled the final request.

Between June 1 and June 30, LAP attorneys requested documents for 21 matters.  DYS provided all of the initial documents for 15 of the 21 requests and provided some but not all documents for 2 other requests.  DYS notified the LAP that three of the twenty-one requests

---

[5]  DYS describes document requests they received prior to March 28, 2009 as "backlogged" requests.  Though some of the requests represented by this categorization related to the backlog matters I defined above, "backlogged" requests refers to all outstanding document requests LAP attorneys made between July 1, 2008 and March 27, 2009. *Second Report* at 19.

[6]  After I submitted the *Second Report* to the Court, attorneys from the DYS and the LAP compared their copies of the Document Request Log and found one additional request that was not recorded in the earlier document request logs I had received from DYS.  This explains the change from the total number of document requests that I indicated in the *Second Report*.  See *Second Report* at 19.

[7] As of May 1, 2009, the cut-off date for the *Second Report*, DYS had responded fully to 162 requests.

would be delayed while an internal investigation was completed, and the Mezibov firm placed one of these requests on hold.

Between July 1 and July 28, LAP attorneys submitted 15 requests for documents. DYS fulfilled three of the fifteen requests in their entirety and provided some but not all documents for an additional three requests.[8] DYS notified the LAP that the central office would require an extension of the deadline for providing documents because an investigation of the underlying incident had not been completed for one request.[9] The remaining eight requests are within the fourteen business day deadline for response and thus are not yet due. The following table reflects each of the requests LAP attorneys submitted between March 30 and July 28, 2009.

LAP Document Requests Submitted Between March 30 and July 31, 2009

| Month | Received | Completed | Partially Completed | Extension Notification | Overdue | Not Yet Due | On Hold By Mezibov |
|---|---|---|---|---|---|---|---|
| **April, 2009 (inc 3/30)** | 34 | 34 | 0 | 0 | 0 | 0 | 0 |
| **May, 2009** | 8 | 7 | 1 | 0 | 0 | 0 | 0 |
| **June, 2009** | 21 | 15 | 2 | 3 | 0 | 0 | 1 |
| **July, 2009** | 15 | 3 | 3 | 1 | 0 | 8 | 0 |
| **TOTAL** | 78 | 59 | 6 | 4 | 0 | 8 | 1 |

This represents a significant improvement. DYS's diligent efforts in fulfilling its responsibilities as defined in Kelly Castle's April 2, 2009 memorandum required a substantial

---

[8] Of the remaining six partially completed requests, "4 are waiting for medical records, 1 for grievance documents and 1 for JCO discipline records. All other initial documents for all partially completed requests have been provided." *Memo from Sara Vollmer to Vince Nathan, Jim Holzhauer, Kelly Castle, and Brenda Cronin*, July 28, 2009.

[9] Since March 30, 2009, DYS notified the LAP that the central office required an extension on ten requests. DYS has since fulfilled six of these ten requests. In each of the ten cases, DYS requested an extension because the internal investigation of the incident to which the request related was ongoing.

commitment of time and resources.[10]   DYS's efforts also have proven to be a catalyst for a significant decrease in the number of open matters the LAP maintains.[11]

The trend in the number of requests LAP attorneys have submitted each month also is encouraging.  LAP document requests have decreased each month since March, even when one excludes the month of May as an outlier.  While a low number of document requests is not necessary to demonstrate that LAP is continuing to refine its determinations of which complaints require document requests – a larger number of serious complaints would certainly justify an increase in the number of document requests – the trend towards fewer document requests represents LAP attorneys' appreciation for the resources that must be applied to fulfilling each request.  Though nearly all complaints of excessive use of force by staff, failure to protect, or a denial of medical care will result in a document request, LAP attorneys do not consider a request for records to be an automatic or necessary step for every potentially colorable complaint.

IV.     Status of Backlog Matters

LAP attorneys have continued to make significant progress in resolving youths' complaints contained in the backlog files.  As of April 30, 2009, the cut-off date for the inclusion of data in the *Second Report*, LAP attorneys had resolved 140 of the 180 total backlog matters. *Second Report* at 13-15.  Since then, LAP counsel has closed an additional 32 backlog matters.[12] Of the remaining eight open backlog matters, one involves a potential denial of access to court claim resulting from the expiration of the statute of limitations.  Most important, LAP attorneys

_____

[10]  See Exhibit, *infra* at 12-13.

[11]  I will discuss this decrease in greater detail below.

[12]  This includes two backlog matters, BL100 and BL171, which LAP attorneys merged into two other backlog matters: BL099 and BL170, respectively.

have completed their investigations and are attempting to refer each of the open backlog matters to private counsel or are drafting complaints for youth to file *pro se*.

A.     Statue of Limitations Matters

I noted in the *Second Report* that LAP attorneys investigated 13 matters in which the statute of limitations had expired to determine whether the complaints in those 13 matters constituted an actionable denial of access to court; 5 of the 13 matters were open at that time.  As of July 31, 2009, only one of these matters remains open.  LAP counsel closed one matter, BL106, after the complainant refused further assistance from the LAP.  Two other matters, BL091 and BL102, were closed and considered to be abandoned because LAP attorneys were unable to contact the complainants.[13]

The LAP has combined two matters relating to a single youth and affected by the expiration of the statute of limitations, BL099 and BL100, into a single case (the one open backlog case referred to above) and is currently investigating this complaint on behalf of that youth.  LAP attorneys were unable to contact this youth for several months after the youth indicated that he wanted assistance from LAP counsel; the youth subsequently responded to a letter from LAP in July 2009 and returned a signed release form.

B.     Remaining Backlog Matters

Excluding the statute of limitations cases, there are a total of 167 backlog matters.  Seven of these 167 matters remain open.  LAP counsel is attempting to refer two of these matters to private counsel: BL030, in which the complainant alleges a denial of medical treatment, and

---

[13]  If a youth contacts LAP and expresses an interest in pursuing a complaint after LAP counsel has closed the youth's case, the LAP will reopen the case and assist the youth with his or her complaint.  *Memo from Stacy Hinners to Vince Nathan, Jim Holzhauer, Kelly Castle, Sara Vollmer, and Rich Cholar*, August 4, 2009.

BL141, in which the complainant alleges that a Juvenile Correctional Officer used excessive force while restraining him.  LAP attorneys are drafting *pro se* complaints in the other five matters.

Since May 1, LAP attorneys have closed 27 backlog matters.[14]  LAP attorneys closed nine of the twenty-seven cases as abandoned.  In these cases, the youth initially informed LAP that they wished to pursue their complaint, but subsequently did not respond to LAP's attempts to contact them.  In five of the twenty-seven matters, the complainant informed LAP counsel, either by telephone or at a facility, that he or she did not want to continue pursuing the complaint.  LAP closed three of the twenty-seven cases after LAP attorneys were unable to contact the youth.[15]

In four of these twenty-seven cases a LAP attorney closed the youth's case after the attorney's investigation concluded the complaint had insufficient merit to support a violation of §1983.  LAP closed one matter when the youth retained private counsel after LAP finished its investigation of the complaint.  LAP counsel transferred the case to the youth, who will proceed with the assistance of private counsel.

LAP closed an additional five matters as a result of a recent phenomenon.  In these matters, a LAP attorney completed an investigation into a youth's complaint and found sufficient merit to proceed.  The youth has indicated that he or she wants to pursue the complaint, but in each instance, the youth is a minor and, therefore, the LAP attorneys must obtain the consent of the youth's guardian in order to proceed.  LAP was unable to proceed, however, because the

---

[14]   This total does not include any complaints that may have been affected by the expiration of the statute of limitations.

[15]   In none of these cases had the complainant in these matters earlier expressed a wish to pursue their respective complaints.

guardian of each youth refused to give approval.[16]  Attorneys from the LAP and DYS currently are working to determine the appropriate way to proceed in cases like these.

V.     Status of Non-Backlog Matters

As I noted above, DYS's efforts to comply with its responsibilities outlined in Kelly Castle's April 2, 2009 memorandum have contributed to a significant reduction in the number of open cases that the LAP maintains.  I shall discuss the LAP's open cases in the context of two periods: those cases that LAP opened between July 1, 2008 and April 30, 2009, and those cases that LAP opened between May 1 and July 31, 2009.

As of April 30, 2009, the cut-off date for the *Second Report*, the LAP had 155 open matters.  LAP attorneys from the Mezibov firm opened each of these matters between July 1, 2008 and April 30, 2009.  As of July 31, 2009, LAP had closed 125 of these 155 cases.  Of the remaining 30 cases, LAP has prepared or is preparing a *pro se* complaint to be filed by the youth in 13 cases,[17] while 16 of the 30 cases remain under investigation.  The remaining matter currently is being reviewed by private counsel.

As of July 31, 2009, the LAP had 50 matters that a LAP attorney had opened between May 1 and July 31, 2009 and which the LAP continued to pursue on behalf of youth.  LAP attorneys are drafting *pro se* pleadings in three of these 50 matters.  LAP attorneys are currently investigating the remaining 47 matters.

---

[16]   LAP attorneys informed me that this phenomenon has occurred in non-backlog cases as well.

[17]   LAP counsel has completed a *pro se* complaint in seven of these thirteen cases.  LAP will meet with each youth to review the final version of the complaint.

In summary, LAP's non-backlog caseload has declined from 155 on April 30, 2009 to 80 on July 31.  These 80 cases include 30 cases that were open on April 30 and 50 cases LAP opened after that date.

VI.     Conclusion and Recommendations

In conclusion, on April 30, 2009, the LAP had a total of 195 open matters; this includes both 40 backlog and 155 non-backlog matters.  In the months since the *Second Report*, LAP attorneys have reduced this number by nearly 55 percent.  On July 31, 2009, the LAP had a total of 88 open matters.  Of these 88 matters, LAP is drafting or has drafted a pleading to be filed *pro se*, or has submitted to private counsel for review, 25 matters.

This reduction in the total number of open cases is a welcome sign of progress.  The same is true of the recent submission of several files for consideration by outside counsel and the increased number of files that have resulted in the drafting of *pro se* complaints. The LAP's resolution of many of the complaints from youth that were outstanding at the time of the *Second Report* has produced a clearer picture of the prospective size of the LAP's open caseload.  This reduction in the number of open cases clearly supports my earlier recommendation that LAP maintain a staffing level of 2.5 to 3 attorneys, defined as a lawyer billing 30 hours per week, and I shall not alter that recommendation in this report.  Thus, the Mezibov firm should retain sufficient resources to fulfill this requirement.

While maintaining this capability, however, the provider may bill more than 387 hours in a given monthly statement so long as the total annual costs do not exceed the amount of the DYS contract for fiscal year 2010, and thus violate the terms of LAP's contract with the DYS. Moreover, I shall recommend that the court not treat any failure to bill the minimum number of hours required by this recommendation (322.5 hours per month) as problematic so long as the

professional staff hours actually expended continue to be sufficient to accomplish the goals of the Legal Assistance Program.

It is clear to me that the parties and LAP counsel have achieved a level of cooperation that has permitted the Legal Assistance Program to begin to settle much more comfortably into the culture and practice of the DYS.  I recommend that the Court direct me to file a fourth report in six months.  If that report demonstrates continued progress in the development of the program (including compliance with all approved recommendations in previous reports and the avoidance of backsliding) it is my hope that that report will mark the beginning of significantly reduced external monitoring of the defendants' compliance with the Court's remedial orders in the *J.P.* litigation.

Respectfully submitted,

/s/ Vincent M. Nathan
Court Monitor

Exhibit

Date:                    April 2, 2009

To:                      Vince Nathan, Court Monitor
                         J.P. v. Stickrath

From:                    Kelly Castle, Chief Legal Counsel
                         Ohio Department of Youth Services

Re:                      Management of Records Requests from the Legal Assistance Program

      Pursuant to your request, this memo serves to outline the Ohio Department of Youth Services' process to address records requests from the Legal Assistance Program (LAP) provider. Upon an initial request received from the LAP provider on or after March 30, 2009 and for all requests received through March 27, 2009, DYS will provide the following:

1. Copies of the incident report and any attachments;
2. Copies of the investigation report and any attachments;
3. Access to video if it is attached to the investigation;
4. Copies of any grievances filed by the youth related to the incident;

      Please note that the documents referenced above will be provided no matter what documents were requested unless the request was for some but not all of the documents noted above. In that instance, the department will provide only what was requested from the list above. The department will also provide medical records relevant to the issue with an appropriate medical release.

      Documents in response to requests received through Friday, March 27, 2009, will be provided within 30 days. Documents in response to requests received beginning Monday, March 30, 2009 will be provided within 14 business days of receipt of the request. If it is determined that the response to a records request will take longer than the allotted days, we will notify the monitor or requestor, as applicable, and provide an explanation.

      Because the parties to the JP litigation have verbally agreed to a confidentiality agreement, the documents provided will be unredacted even though the agreement has not yet been filed with the court. The only exception to this is specially protected confidential information. Specially protected confidential information includes, but is not limited to, HIV/AIDs, substance abuse, mental health diagnosis and treatment, and education records. If a release from the youth and the parent/guardian, if applicable, has been provided that allows the release of the specially protected confidential information, it will also be provided unredacted. Otherwise, that information will be redacted.

After receiving the documents in response to an initial request, the LAP provider will review them and make a threshold determination whether there is a colorable claim (violation of a federal constitutional right by an employee of DYS, acting under color of state law). If there is a colorable claim, the LAP provider will refer the case to an attorney for representation or, if that cannot be accomplished within a reasonable time, will assist the youth in filing a *pro se* complaint. If the LAP provider is unable to make a determination because additional information is needed, the LAP provider may make a second request for additional documents. The second document request must be narrowly tailored by the LAP provider to include only those documents that are necessary to make a threshold determination of a colorable claim.

Both initial and second requests for documents from the LAP provider will be sent via e-mail to the Division of Legal Services who will log the request and update the log as needed until the request is completed. Requests must specify the name and DYS number of the youth, a description of the incident, the institution where the incident occurred and an approximate date of the incident, if known. Second requests must also specify what additional documents are being requested. Any requests seeking specially protected confidential information or permitting us to send specially protected confidential information without redacting, must be accompanied by the department's new authorization form completed as appropriate.

Since our meeting on March 19, we have been actively working on the backlog and have already provided some documents to the LAP provider. We are working diligently to provide all the responses within our 30 day timeframe.

If you have any questions, please contact me at 614-728-6968.

c:    Brenda Cronin, Executive Assistant
      Richard Cholar, Assistant Attorney General
      Sara Vollmer, DYS Legal Counsel